UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARBOR REALTY MORTGAGE SECURITIES SERIES 2005-1, LTD., <br><br> Plaintiff, <br><br> -against- <br><br> BETHANY HOLDINGS GROUP, LLC, TERRY AND ROSE KNUTSON 2000 FAMILY TRUST, GREGORY P. GARMON, JEFFREY SILVERMAN, and TERRY KNUTSON, <br><br> Defendants. | Case No. 09 Civ. 8395 <br><br><br><br><br> ANSWER |

Defendants Terry Knutson and Terry and Rose Knutson 2000 Family Trust ("Defendants"), answer the Complaint of plaintiff Arbor Realty Mortgage Securities Series 2005-1, Ltd., ("Plaintiff" or "Arbor") as follows:

## NATURE OF THE CASE

1.      The allegations in paragraph 1 do not require a response.  To the extent a response is required, Defendants deny the allegations in paragraph 1 of the Complaint.

2.      The allegations in paragraph 2 do not require a response.  To the extent a response is required, Defendants deny the allegations in paragraph 2 of the Complaint.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 of the Complaint.

4.      The allegations in paragraph 4 do not require a response.  To the extent a response is required, Defendants deny the allegations in paragraph 4 of the Complaint.

## PARTIES

5.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Complaint.

847190-3

6.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Complaint.

7.    Deny the allegations in paragraph 7 of the Complaint except admit that the trust is a California trust.

8.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Complaint.

9.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint.

10.    Deny the allegations in paragraph 10 of the Complaint except admit that Defendant Knutson is a California resident.

## JURISDICTION AND VENUE

11.    The allegations in paragraph 11 do not require a response.  To the extent a response is required, Defendants deny the allegations in paragraph 11 of the Complaint.

12.    The allegations in paragraph 12 do not require a response.  To the extent a response is required, Defendants deny the allegations in paragraph 12 of the Complaint.

## FACTUAL ALLEGATIONS

13.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint.

14.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint.

15.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint.

16.    Deny the allegations in paragraph 16 of the Complaint and refer to the document for its complete terms.

2

17.     Deny the allegations in paragraph 17 of the Complaint and refer to the document for its complete terms.

18.     Deny the allegations in paragraph 18 of the Complaint and refer to the document for its complete terms.

19.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint.

20.     Deny the allegations in paragraph 20 of the Complaint and refer to the Loan Documents for their complete terms.

21.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint.

22.     Deny the allegations in paragraph 22 of the Complaint except admit the filing of a bankruptcy petition and refer to the Loan Documents for their complete terms.

23.     Deny the allegations in paragraph 23 of the Complaint and refer to the documents for their complete terms.

## FIRST CLAIM FOR RELIEF
## (BREACH OF THE RECOURSE GUARANTY)

24.     Repeat the responses above in paragraphs 1-23 as if set forth fully herein.

25.     Deny the allegations in paragraph 25 of the Complaint.

26.     Deny the allegations in paragraph 26 of the Complaint.

27.     Deny the allegations in paragraph 27 of the Complaint.

28.     Deny the allegations in paragraph 28 of the Complaint.

29.     Deny the allegations in paragraph 29 of the Complaint.

## SECOND CLAIM FOR RELIEF
## (BREACH OF THE LIMITED GUARANTY

30.     Repeat the responses above in paragraphs 1-29 as if set forth fully herein.

847190-3

31.     Deny the allegations in paragraph 31 of the Complaint and refer to the document for its complete terms.

32.     Deny the allegations in paragraph 32 of the Complaint.

33.     Deny the allegations in paragraph 33 of the Complaint and refer to the document for its complete terms.

34.     Deny the allegations in paragraph 34 of the Complaint and refer to the document for its complete terms.

35.     Deny the allegations in paragraph 35 of the Complaint.

## THIRD CLAIM FOR RELIEF
## (BREACH OF THE INTEREST GUARANTY)

36.     Repeat the responses above in paragraphs 1-35 as if set forth fully herein.

37.     Deny the allegations in paragraph 37 of the Complaint and refer to the document for its complete terms.

38.     Deny the allegations in paragraph 38 of the Complaint and refer to the document for its complete terms.

39.     Deny the allegations in paragraph 39 of the Complaint and refer to the document for its complete terms.

40.     Deny the allegations in paragraph 40 of the Complaint and refer to the document for its complete terms.

41.     Deny the allegations contained in paragraph 41 of the Complaint.

## FOURTH CLAIM FOR RELIEF
## (ATTORNEY'S FEES)

42.     Repeat the responses above in paragraphs 1-41 as if set forth fully herein.

43.     Deny the allegations in paragraph 43 of the Complaint and refer to the document for its complete terms.

847190-3

44.     Deny the allegations contained in paragraph 44 of the Complaint

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

45.     This action arises out of one in a series of complex real estate acquisitions and financings which Lehman Brothers Bank, FSB ("Lehman"), funded between March and June 2007, in furtherance of its then still booming mortgage-backed loan securitization business. Plaintiff Arbor seeks to enforce guarantees allegedly executed and delivered to Lehman by Terry Knutson and the Terry and Rose Knutson 2000 Family Trust (collectively the "Knutson Defendants"), along with co-defendants Bethany Holdings Group, LLC ("Bethany") and its principals, Gregory Garmon ("Garmon") and Jeffrey Silverman ("Silverman").

46.     The guarantees arise out of a series of lending transactions between Lehman and defendant Bethany where Lehman lent Bethany approximately one billion dollars in ten separate transactions within an eight-month period.  Every single one of those transactions is now in default.

47.     The transactions gave Bethany portfolios of more than forty separate apartment complexes entailing thousands upon thousands of apartment units strung out across the United States.

48.     At the time Lehman funded these transactions, Lehman knew Bethany lacked the expertise and infrastructure to acquire and manage so many units, knew Bethany's projections for the projects were wildly overstated, and knew the real estate market was crumbling rapidly.

49.     The Knutson Defendants, however, lacking experience in complex real estate acquisitions and financings, did not comprehend their nature, structure and terms, and were caused to execute signature pages for the guarantees involved in this action and myriad other loan documents by reason of Lehman's material misrepresentations, fraudulent concealment and

847190-3

the undue influence which Lehman, Bethany and its counsel exerted upon the Knutson Defendants.

50.     Knutson is the 67-year old former owner and operator of a bakery business located in Lodi, California.   Knutson's father bought the bakery from its founder in 1954. Knutson entered the business in the late 1960's following graduation from junior college. Knutson thereafter devoted his entire adult life to the bakery's operations and its eventual development into a national producer of specialty baked goods.

51.     In November 2006, Knutson sold the bakery business.  Soon afterward, he sold the land on which the bakery and related facilities were situated.  Knutson realized substantial proceeds from these sales.  In connection with the land sale, Knutson was advised to reinvest the sale proceeds in a tax-free exchange for other real estate pursuant to Section 1031 of the Internal Revenue Code.  Knutson was also advised that a Section 1031 exchange would have to be arranged quickly, since the Internal Revenue Code required his designation of the exchange property within 45 days and his purchase of the property within 180 days.  Knutson promptly commenced efforts to arrange a Section 1031 exchange.

52.     In December 2006, a consultant whom Knutson met at an estate planning and wealth management conference in San Diego, California referred Knutson to defendants Garmon and Silverman for assistance in arranging a Section 1031 exchange.  Garmon and Silverman were the principals in the then high-flying, but now defunct and bankrupt, Bethany.

53.     Upon information and belief, Bethany owned and managed many large rental apartment properties located in several different areas around the country.  Garmon and Silverman told Knutson that Bethany would assist him in arranging a Section 1031 exchange

6

involving the acquisition of rental apartment properties in return for an equity interest in the deal and the right to manage and operate the properties. Knutson agreed to this arrangement.

54. At the same time, Garmon and Silverman urged Knutson to join with them and their company in making similarly-structured investments for the acquisition of other properties. Aware that Knutson lacked any prior experience in large-scale real estate investment and finance, Garmon and Silverman represented to Knutson that they and Bethany had extensive real estate investment experience and could identify suitable investment properties, have their legal counsel handle the acquisitions and related financings, and provide all necessary property management services.

55. Garmon and Silverman further represented that they and Bethany enjoyed a close relationship with Lehman which had an office in the same Irvine, California, building-complex in which Bethany's headquarters was located.

56. Mark Osgood was the Lehman executive who originated the loans that are the subject of this action. He had recently opened Lehman's "Newport Beach, CA office" as a Managing Director of the Global Real Estate Group. Lehman paid Osgood in 2007 a guaranteed salary of $4 million plus additional bonus. His sole responsibility was to "originate loans" by finding borrowers for Lehman's lending operation.

57. Mr. Osgood had a long standing relationship with Messrs. Garmon and Silverman, the Bethany promoters. Beginning in December 2006, Lehman entered into a rapid-fire series of deals with Bethany issuing more than $1 billion in loans in only eight months. These loans were made prior to Mr. Knutson's introduction to Bethany.

58. Bethany, with Lehman's financial help, was inundated with thousands of residential units in several states across the nation including Maryland, Texas and Florida, all

being operated by an under-capitalized Bethany staff, unable to operate, manage and improve such a bloated real estate portfolio.

59.    Upon information and belief, Garmon, Silverman and Osgood shared the high life together, flying on private jets for weekends in Phoenix, staying at very expensive hotels, drinking expensive wine and celebrating "successful closings" in private rooms at the finest restaurants money could buy.

60.    Through Mr. Osgood and others, Lehman well knew key features of the Garmon/Silverman enterprise that were unknown to the Knutson Defendants.  Among other things, Lehman understood that Garmon and Silverman had nominal capital and their guarantees were worthless.

61.    Garmon and Silverman represented, moreover, that because Bethany had arranged several large real estate loans with Lehman that Lehman was therefore familiar with their financial condition and business model and that funding for their investments with Knutson would be available from Lehman as their lender of choice.

62.    Based on Garmon's and Silverman's representations, Knutson believed Bethany and its principals were experienced, responsible and financially capable real estate investors and operators who enjoyed the backing of a major bank which was affiliated with one of the country's leading investment banking firms.  Lehman, through Osgood, also represented that Bethany and its principals were experienced, responsible and financially capable real estate investors and operators.

63.    During one of Knutson's early visits to Bethany's offices to discuss real estate investment opportunities he met with Osgood who presented his business card and discussed Lehman.

847190-3

64.    Lehman's ongoing manifestation of support for Bethany and its principals in their dealings with Knutson led Knutson to conclude that investments with Bethany would be safe. Knutson believed that as the prime lender to the deals, Lehman had its own capital at stake and that its real estate experts had concluded the financial underpinnings of the transactions were prudent.

65.    Garmon, Silverman and Lehman thus gained Knutson's trust and confidence and, within only a few weeks after their initial meeting, convinced him to participate in a three-month, nearly $600 million buying-spree in which limited liability companies organized by Bethany and its counsel acquired numerous apartment buildings comprising approximately 7,000 rental units located on 18 different sites in three different states.   These acquisitions were consummated with increasingly large cash contributions by Knutson in a rapid series of five transactions all but one of which were financed by Lehman.  Lehman received increasingly large and lucrative transaction fees for these financings while at the same time generating large real estate mortgage loans which it would pool with other such loans, securitize and sell to investors, reaping yet more lucrative fees.

66.    Lehman made the first of these loans in connection with the second of Knutson's investments with Bethany.  The transaction closed at the end of March 2007 and resulted in the acquisition of the Summit Apartments located in Oceanside, California.  Lehman provided a $25.5 million loan for this transaction and required guarantees for the full amount from each of Knutson, Bethany, Garmon and Silverman.  Although Garmon and Silverman, based on their prior dealings with Lehman, understood Lehman's requirement of personal guarantees to support highly-leveraged real estate loans, Knutson was not informed of this requirement until just prior to the final closing of the Summit Apartments purchase, at which time the guarantee was

presented for him to sign on a non-negotiable basis. The Lehman and Bethany representatives ran the closing in a highly-pressured manner, pushing Knutson to complete the process before the next month's rents for the property came due, without time for Knutson to review or understand the loan documents, and in what he perceived to be a frenzied scramble to make numerous last-minute changes to those documents. Upon information and belief, the seller of the property was another limited liability company which Bethany, acting by and through Garmon and Silverman, had formed less than a year earlier, and whose members were also investors in yet other Lehman-financed deals. Though not disclosed to Knutson by Lehman or Bethany, Knutson has since learned that the "opportunity" for his investment in the Summit Apartments arose because the prior investors were dissatisfied with the performance of that property and demanded its sale.

67.     A short time later, Knutson engaged in a third transaction with Garmon and Silverman. This transaction closed as of April 27, 2007 and resulted in the $89.1 million acquisition of four rental apartment projects: the Waterfield Apartments, the Rolling Hills Apartments, the Rockrimmon Apartments and the Falcon Pointe Apartments located in Aurora, Castle Rock and Colorado Springs, Colorado. These properties together comprise over 1,100 apartment units. Lehman provided financing of $97.6 million for this transaction in the form of a $65 million first mortgage loan which it would later assign to a mortgage pool and securitize and a subordinate note of $32.6 million (which would later be converted into a "mezzanine loan" for later assignment to a so-called mezzanine lender with which, upon information and belief, Lehman or its affiliates had prior dealings. This structure necessitated the formation of ownership and mezzanine limited liability companies for each of the four Colorado properties. Because the financing for the third transaction was larger in amount and involved four times

10

more properties than the financing for the second transaction, the loan documents involved in the third transaction were more numerous and of a more complicated nature than those involved in the second transaction. In the third transaction, as in the second transaction, Lehman required Knutson to join Bethany, Garmon and Silverman as guarantors, though the complicated financing structure employed in the third transaction entailed a greater number and different kinds of guarantees than had been required in the second deal. The guarantees were again required on a non-negotiable basis and evolved along with the many other loan documents through a series of e-mails emanating from Lehman's representatives. By means of many additional e-mails, the loan documents for the third transaction went through cycles of changes as Lehman and Bethany again pushed Knutson to close the deal in a highly-pressured fashion so as to beat the clock to the properties' May last rent date. The closing process itself, moreover, was conducted by e-mail. In this manner, signature pages for the guarantees and other complex loan documents were distributed to the participants for execution even as deal points were being addressed and documents were consequently undergoing further change. In completing these transactions, Knutson reasonably relied on the expertise and loyalty of Bethany and their transaction counsel as well as on the reputation and good faith of Lehman as the facilitating lender.

68. The guarantees and other complex loan documents involved in this action arise out of loans in the approximate amount of $474.31 million made by Lehman to purchase twelve properties constituting over 5,000 apartment units in and around Phoenix, Arizona. Known as the "Kingdom I" and "Kingdom II" property portfolio, it was reportedly the largest real estate acquisition of its kind in Arizona state history. Many of these loans and their underlying guarantees were, then, sold off by Lehman to other financial players such as Arbor.

69.     In June 2007, Bethany purchased the portfolio of properties, using a series of newly-formed entities. Mr. Knutson and the Knutson Trust invested approximately $52 million in Bethany affiliates to provide equity funding for the purchase, which was completed in two phases.

70.     This case involves the second phase, in which a Bethany affiliate, Phoenix Kingdom II, LLC ("Kingdom II"), acquired five apartment properties. Leveraging the Knutson Defendants' investment, Lehman financed the purchase with a loan that was divided into three separate pieces to sell on the secondary market. First, Lehman made a property-secured loan in the amount of $160.5 million to Kingdom I. Another Bethany affiliate, Phoenix Kingdom II MezzI, LLC, borrowed an additional $50 million structured as a senior mezzanine loan and a third affiliate, Phoenix Kingdom II Mezz2 LLC, borrowed a further $27.5 million structured as a junior mezzanine loan. The term "mezzanine" denotes that the loan is not secured by the underlying real property, but rather by a pledge of shares or membership interests in a holding company. The financing was premised on the proposition that Bethany would improve the residential units, thereby supporting the higher rents necessary to service the debt and generate the illustrated investment returns, sometimes referred to as "value added" real estate investment. The loan agreements thus established a series of reserves, including reserves for construction and rehabilitation of the properties.

71.     At the closing, Kingdom II entered into a Mortgage Loan Agreement with Lehman for a promissory note in the principal amount of $160.5 million. The Knutson Defendants, Bethany, Garmon and Silverman, all signed a Guaranty of Recourse Obligations for the Mortgage Note. For the Senior Mezzanine Loan and Junior Mezzanine Loans, these same individuals and entities entered into separate guarantees. Mr. Knutson was presented only with

signature pages of the Guarantees at closing which were required to be signed as non-negotiable elements of the deal.

72.    For Lehman, the transaction generated extraordinary fees with nominal risk because the loans would be transferred to others.

73.    In connection with this rapid series of complex transactions, Lehman concealed from the Knutson Defendants facts which materially increased the risk of their undertaking as guarantor beyond that which Lehman had reason to believe they was willing to assume.

74.    Upon information and belief, Lehman, as a principal lender for Bethany, had unique access to financial statements and other documents bearing on Bethany's financial condition.  As a result, Lehman knew that Bethany was under-capitalized, and that its business and holdings—acquired with several hundreds of millions of dollars of Lehman-arranged financings—were concentrated in non-diverse portfolios of Class B (at best) rental apartment properties, the overwhelming majority being of older vintages and located in secondary rental markets.

75.    Upon information and belief, Lehman similarly knew that Bethany's properties were saddled with extraordinarily high debt.  The debt in many cases exceeded 90 and even 100 percent of property value and burdened Bethany with commensurately high debt service requirements.  Lehman similarly knew that Bethany had borrowed or guaranteed many hundreds of millions of dollars of highly-leveraged real estate loans, thus having contingent liabilities which dwarfed any assets it could legitimately claim to own.  Thus, while Lehman knew that Knutson had a very substantial net worth as a result of the sale of his bakery business, Lehman also knew that Bethany was essentially insolvent and lacked any meaningful capacity to assume and fulfill its obligations as the Knutson Defendants's co-guarantor under the guarantees

involved in this action or, indeed, those involved in any of the several transactions which the Knutson Defendants and Bethany consummated. It was in Lehman's financial interest, however, to induce the Knutson Defendants to execute the required guarantees both as a condition to the transactions and as a means to qualify such loans for favorable rating, securitization and resale treatment.

76.    Upon information and belief, Lehman similarly knew that Bethany was essentially a "house of cards" and that any market downturn or other adverse change could quickly render it incapable of meeting debt service requirements, triggering portfolio-wide loan defaults and—as has recently occurred—Bethany's immediate and total collapse. Under such a scenario, Bethany would be incapable of managing and operating the properties which it acquired with the Knutson Defendants. Indeed, the properties would be subject to foreclosure.

77.    Lehman also knew Bethany was significantly over-leveraged and that once its deal flow stopped, Bethany too would collapse since it never had a viable plan to support its staff and operations from the rental income generated by its portfolio of real property.

78.    Upon information and belief, Lehman similarly had unique access to financial statements and other documents bearing on the financial conditions of Garmon and Silverman. Upon information and belief, Lehman was thus aware that while Garmon and Silverman bore the trappings of financial success, including lavish residences in Newport Beach and San Juan Capistrano, California and other "luxury-lifestyle" perquisites, and had guaranteed hundreds of millions of dollars of contingent liabilities in connection with Bethany's real estate acquisitions. Thus, while apparently backing Garmon and Silverman along with Bethany, Lehman knew that Garmon and Silverman, like their company, were essentially insolvent and lacked any meaningful capacity to assume and fulfill their obligations as the Knutson Defendant's co-

guarantors under the guarantees involved here or those involved in any of the other Knutson/Bethany deals. Further, Lehman knew that the Knutson Defendants were not aware of the true financial condition of Bethany and its principals. Nonetheless, Lehman's ability to capture the purported guarantees from Knutson depended on sustaining Knutson's misperception that knowledgeable, experienced, financially credible, competently advised real estate professionals were sharing the guarantee obligation with him.

79.    Upon information and belief, Lehman had reason to believe the facts set forth in paragraphs 73 through 78 hereof were unknown to Knutson at the time of the transactions involved in this action. First, Lehman had unique access to the facts concerning the precarious financial conditions of Knutson's purported co-investors and co-guarantors. Second, despite its access to such information, Lehman itself did not disclose these facts to Knutson in connection with the closing of the very large loan for which the guarantees here were required or in connection with the closing of any of the other large loans for which guarantees were previously required. Third, upon information and belief, Lehman knew or should have known that Bethany and its principals did not disclose their precarious financial conditions to Knutson, since they were seeking his ongoing participation in their real estate investment activities and his financial support for large real estate acquisitions.

80.    Moreover, Lehman had a reasonable opportunity to communicate to Knutson the facts alleged in paragraphs 73 through 78 hereof. Upon information and belief, Lehman was aware of the facts at the time of Knutson's introduction to Lehman's representative, Mark Osgood, which occurred in early 2007, before the closing of any of Knutson's investments with Bethany. Lehman therefore knew the facts months before the closing of the financing for which the guarantees involved here were required as of June 1, 2007.

81.    Further, Lehman had a duty to disclose to Knutson the facts alleged in paragraphs 73 through 78 hereof.  Upon information and belief, this duty of disclosure existed by reason of several factors, including Lehman's unique access to the facts, its close working relationship with Bethany and its principals, its manifestation of confidence in Bethany and its principals by continuing to provide substantial financings for their large real estate acquisitions, its awareness of Knutson's lack of prior experience as an investor with Bethany, and its awareness of the trust and confidence which Knutson had placed in Bethany, its principals and their counsel.

82.    In failing to comply with its duty of disclosure, Lehman conveyed to Knutson the misimpression that Bethany and its principals were creditworthy and otherwise financially sound, though Lehman had unique access to material information which indicated a contrary state of facts.  Had the Knutson Defendants known the true facts, they would not have executed the signature pages for the guarantees involved in this action or any of the related loan documents.  In these circumstances, Lehman's nondisclosure to the Knutson Defendants constituted material misrepresentation.  By reason of such fraudulent misrepresentation and concealment, the guarantees involved in this action are void and unenforceable as against the Knutson Defendants.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

83.    The Knutson Defendants repeat and reallege paragraphs 1 through 82 of this Answer as if fully set forth herein.

84.    Working with Garmon and Silverman, Lehman prepared both appraisals and projections for the properties that were designed to and did induce the Knutson Defendants to participate in the transactions that are the subject of this action.  These forecasts were deceptive in several respects.

16

85.    Specifically, Mr. Knutson received projections from Garmon and Silverman which showed a profitable sale or refinancing upon maturity. Upon information and belief, these projections were prepared by and/or reviewed by Lehman.

86.    These forecasts rested upon the flawed premise that Lehman could continue its lending program, thereby providing a platform for a new buyer to take out the old loan at a higher price.

87.    The forecasts submitted to Mr. Knutson also indicated that rents would increase greatly. No basis existed for these forecasts. Mr. Osgood and Lehman knew that there was no basis for these projections. Indeed, Lehman already knew that the real estate market was collapsing at the time it made the loans. Lehman also knew that Bethany was concentrated in non-diverse portfolios of properties, the majority of which were of older vintages located in secondary markets. Lehman also knew that Bethany was saddled with an extraordinarily high, crippling amount of debt. Indeed, in this project alone, Bethany borrowed in excess of 100% of the purchase price. Yet Lehman applied its "good name" to the deal. With Lehman's name behind the deal, the Knutson Defendants reasonably relied on these forecasts as reliable and generated in good faith.

88.    Lehman and Bethany's representations were false, made with knowledge, plan and motive to deceive the Knutson Defendants and on which the Knutson Defendants relied on to their detriment.

89.    By reason of such fraudulent misrepresentation, the guarantees involved in this action are void and unenforceable as against the Knutson Defendants.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

90.    The Knutson Defendants repeat and reallege paragraphs 1 through 89 of this Answer as if fully set forth herein.

17

847190-3

91.    Throughout the course of the events described above, Bethany's principals, Garmon and Silverman, represented to Knutson that they shared common interests with him regarding the complex real estate acquisitions and related financings which they would arrange for his participation; that they and their counsel would be committed to act in his best interests regarding such transactions; and that he could and should rely on them and their counsel for guidance and to represent and protect his interests in connection with those transactions. Bethany's counsel, moreover, confirmed to Knutson that they were acting on his behalf for such purposes.  Because of Knutson's trust and confidence in Bethany's principals and their counsel, Knutson believed he should rely on them for advice and representation with respect to real estate acquisitions and financings.  Knutson similarly accepted that he could depend on Bethany's principals and their counsel to act in a manner consistent with his best interests concerning such matters.

92.    Having thus induced Knutson to depend on them for guidance and the protection of his interests in complex real estate acquisitions and financings, Bethany's principals and their counsel nonetheless encouraged—and, indeed, highly pressured—Knutson to participate in such transactions, including those involved in this action, in a manner that was not in Knutson's best interest.  They did this, in part, by concealing facts from Knutson, including the facts set forth in paragraphs 73 through 78 hereof.  They also did this by imposing on Knutson to provide signature pages for guarantees and other loan documents.  They also did this by creating a time-pressured environment for the closing of their real estate acquisitions and financings, and thus preventing Knutson from reflecting on the transactions, understanding their nature, structure and terms, or seeking meaningful advice from independent legal counsel.  In this manner, Bethany's principals and their counsel exerted undue influence upon Knutson and manipulated him so that

847190-3

he sacrificed himself for their best interests.  Upon information and belief, Lehman was aware of the undue influence which Bethany's principals and their counsel thus exerted upon Knutson, and Lehman aided and abetted their actions by failing to disclose to Knutson the facts alleged in paragraphs 73 through 78 and by joining in the creation of a time-pressured environment for the closings of their real estate financings.  Upon information and belief, Lehman thus promoted its own interests in generating substantial real estate financing fees and creating more product for its mortgage-backed securitization business.

93.    By reason of the undue influence thus exerted upon Knutson and the Knutson Defendants, their execution of signature pages for the guarantees and other loan documents involved in the transactions at issue were not the product of their free and competent exercise of judgment, but rather was the result of unfair persuasion by Bethany and Lehman, who exploited Knutson's trust in them and impaired his ability to act in the context of such transactions.  As a result, the guarantees involved in this action are void and unenforceable as the Knutson Defendants.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE**

94.    The Complaint fails to state a claim upon which relief may be granted.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE**

95.    Plaintiff is barred from the recovery of damages suffered as a result of any of the transactions and occurrences alleged in the Complaint to the extent that plaintiff failed to mitigate such damages.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE**

96.    Plaintiff is barred from the recovery of damages suffered as a result of any of the transactions and occurrences alleged in the Complaint to the extent that plaintiff or others acting on its behalf or with its approval caused such damages.

847190-3

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

97.    Plaintiff lacks standing to bring the claims asserted in the Complaint.

## AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE

98.    Any purported transfer of the guarantees to Arbor violated the terms of the guarantees.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

99.    The guarantees are unenforceable because they are punitive.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

100.    The guarantees contain unenforceable *ipso facto* provisions that seek to impermissibly curtail a party's right to seek bankruptcy protection.


WHEREFORE, the the Knutson Defendants demand judgment dismissing the Complaint together with costs and such other and further relief as may be deemed just and proper.

## DEFENDANTS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

WHEREFORE, defendants requests trial by jury and requests that the Court enter judgment dismissing the Complaint with prejudice and awarding defendant's costs and attorneys fees and granting any other awards the Court deems just and proper.

847190-3

Dated: New York, New York
       November 17, 2009

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By:    /s/ Kyle C. Bisceglie
       Thomas J. Fleming (TF 4423)
       Kyle C. Bisceglie (KB 6052)
       Howard J. Smith (HS 3556)
       Park Avenue Tower
       65 East 55th Street
       New York, New York 10022
       (212) 451-2300

       and

       Lawrence C. Ecoff
       *Admitted Pro Hac Vice*
       ECOFF, LAW & SALOMONS, LLP
       280 South Beverly Drive, Suite 504
       Beverly Hills, California 90212
       (310) 887-1850

       *Attorneys for Defendants Terry Knutson*
       *and Terry and Rose Knutson 2000*
       *Family Trust*

847190-3